447 P.2d 51

Donald L. **PUENTE**, dba Associates Invest-
ment & Realty Company, Appellant,

v.

Don D. **LEE** et al., Appellees.

No. 8606.

Supreme Court of Arizona.

In Division.

Nov. 21, 1968.

Shimmel, Hill, Kleindienst & Bishop, by
James W. Hill, Phoenix, for appellant.

Harry P. Mallon, in pro. per.

**McFARLAND, Chief Justice:**

Plaintiff-appellant, Donald L. Puente,
hereinafter referred to as plaintiff, sued
Don D. Lee and sixteen others, hereinafter
referred to as defendants, for a real-estate
commission due under an oral contract of
employment to sell 8½ acres of land owned
by defendants. The trial court, sitting
without a jury, found for defendants, and
plaintiff appealed.

In February 1960 plaintiff was in contact
with a group of doctors who wanted to
build and operate their own hospital, and
they informed him that they were interest-
ed in buying a suitable parcel of land.
Plaintiff contacted Don Lee who told him
that a certain tract, owned by him and the
other defendants, was for sale for $100,000
net, and it was orally agreed that if plain-
tiff sold it for $110,000 he would receive a
commission of $10,000. One of the co-
owners was Harry Mallon, who, together
with Don Lee, acted for the group of own-
ers. Mallon, Lee and two of the other co-
owners were licensed real-estate brokers.

Plaintiff relayed the price to the doctors, who were incorporated as "Doccor, Inc.," and took them to see the land. They agreed to buy it, and each of the ten doctors involved put up $500 which was deposited in escrow as earnest money. The escrow instructions were dated April 6, 1960, and contained (as a part of the printed form) a provision that if a real-estate commission were to be paid, the seller would not cancel the instructions without the real-estate broker's consent, and if the instructions were cancelled, the escrow company should pay the broker "a sum equal to ½ of the earnest money." Plaintiff was not named in the instructions. Payments were to start by January 1961. Plaintiff's testimony was that the listing "was strictly verbal." Before the checks for the earnest money had cleared, one of the doctors pulled out of the deal, and another stopped payment on his check, leaving only $4,500 actually in escrow. There was doubt as to whether the deal could be consummated. Defendants conferred with plaintiff and favored an attempt to sell the land to a buyer who would build the hospital and rent it to the doctors. As a result, it was agreed that plaintiff would try to keep the doctors interested, that the earnest money would not be forfeited temporarily, and that both plaintiff and defendants would work together to find another buyer. For this purpose, an argument that would help convince a new prospect to buy would be the fact that there was a group of doctors ready to sign a long-term lease on a hospital if and when one was built.

Following that meeting, all parties worked on the deal. Many prospects were interviewed. At one time a deal was under way to sell to one A. F. Jamison, and new escrow instructions dated June 24, 1960, were prepared, superseding the first one, and increasing the selling price by $5,000 to take care of the commission of another broker who produced the new buyer. These instructions had the same provisions for paying one-half the earnest money to the broker in the event of a forfeiture. However, before these instructions could be signed, Jamison had a heart attack and the deal fell through.

Soon thereafter defendant Jack Lee, a brother of Don Lee and a co-owner of the property, happened to meet an old acquaintance by the name of Tip Austin. In the course of conversation, Austin told Lee that he was with Universal Development Company which was engaged in building hospitals around the country, and was looking for a couple of suitable locations in Phoenix. Lee told his brother Don to contact Austin, and try to sell the property on which he had been working.

Don Lee brought Austin to a meeting with plaintiff and the doctors, and eventually an agreement of sale was consummated for the property. New escrow instructions were prepared, indicating a price of $117,500 and providing: "See separate instructions," and "Broker's commissions will be paid at the close of escrow," and containing the same printed provision for payment of a sum equal to one-half of the earnest money if it were forfeited. The instructions were signed by all seventeen defendant-owners, and by Guaranty Hospital Corporation, a subsidiary of Universal Development Company.

Plaintiff's function in the sale was to keep the doctors interested and ready to sign a lease. He had no part in procuring the buyer. Since Don Lee was also a real-estate broker it was orally agreed that the commission would be raised to $17,500 (leaving the sellers with the required $100,000 net after commissions) of which $10,000 would go to plaintiff (as previously agreed), and most of the balance of $7,500 would go to Lee. This would compensate plaintiff for obtaining the lease from the doctors, and would compensate Lee for obtaining the buyer. To effectuate the terms of this oral agreement, supplemental instructions were signed by the sellers on August 26, 1960, providing that the escrow company should pay the real-estate broker's commission as follows:

"From the proceeds of cash payment, pay broker's commission on the amount of

$17,050.00 to the realty broker shown in the original escrow instructions.

| Associates Inv. & Realty Co. | $10,000.00 |
|---|---|
| Jack V. Lee Realty | 7,050.00 |
| Total Commission | $17,050.00" |

"Associates Inv. and Realty Co." is a trade name used by plaintiff in his business dealings.

Unfortunately, Austin was ousted from Universal Development Corporation, in what is described as an internal executive power struggle, and the new management advised defendants the corporation would not proceed with the purchase. It is not clear whether this decision was reached because of shortage of money, or because of plaintiff's failure to get his doctors to sign a satisfactory lease or to demonstrate sufficient financial responsibility. In an effort to help plaintiff get the doctors to do the necessary, defendants complied with plaintiff's request to release the $4,500 still in escrow. Plaintiff thought that such a gesture would help convince the doctors that they were dealing with men of good will. Defendants indicated that they would still pay plaintiff the $10,000 commission if the deal closed, but, despite all efforts, plaintiff was never able to get the doctors to sign up, and defendants finally cancelled the escrow and forfeited the $17,500 earnest money.

The trial court made findings of fact, including, inter alia, the fact that when the original agreement with Doccor, Inc., appeared to be impossible to consummate, plaintiff orally agreed with defendants that if the latter could sell the land and plaintiff could "bring together and maintain a group of doctors with a net worth of $1,000,000," and if the purchase by a third person was consummated and a lease signed by the doctors and the buyer, a commission of $10,000 would be paid. The finding is supported by the evidence and must be taken to be a fact.

The trial court also found that no group of doctors having a net worth of $1,000,000 was ever brought together or persuaded to sign a lease. This finding is also supported by the evidence.

The defense was based upon two propositions: (1) That no commission was ever earned, and (2) That the agreement to pay a commission was within the Statute of Frauds and that the escrow instructions were insufficient to take the matter out of the statute.

In view of our decision on (1) we find it unnecessary to decide Point (2).

█ Before deciding Point (1) we want to take this opportunity to mention a procedural point. The depositions of three witnesses were taken before the trial. They were never offered or admitted in evidence. They were not even offered for identification. ·Plaintiff-appellant, in his designation of record on appeal, paragraph 14, includes "All depositions offered for identification or admitted in evidence." Defendants-appellees quote extensively from the depositions in their brief, and plaintiff-appellant criticizes such quotations on the ground that the depositions were not introduced in evidence! We have read the depositions. They do not contain stipulations for their use, and since none appear in the record we have not considered their content in making our decision.

As to whether the commission was earned, it should be noted that plaintiff does not deny that the commission was to be contingent upon consummation of the sale of the property. Nor does he deny that the escrow was eventually cancelled by a forfeiture of the earnest money, and was not closed by the buyer's making the promised payments. The escrow clearly provided that the commission was to be paid out of "cash payment," meaning the buyer's payment of the balance due after deducting the earnest money from the selling price. This cash payment was never made.

█ A broker, who procures a buyer, earns his commission if he produces a buyer on the terms required by the broker's listing, or if he procures a buyer with whom the seller enters into a binding agreement

to sell. In Diamond v. Haydis, 88 Ariz. 326, 356 P.2d 643, we said:

> "In determining the rights of a real estate broker to his commission, the established rule of law in this jurisdiction is that:
>
> " '* * * in the absence of a specific contract to the contrary, when a real estate broker has brought together the parties to a sale or exchange of real estate, and they have agreed fully on the terms and entered into a binding contract for such sale or exchange, his duties are at an end and his commission is fully earned, and it is immaterial that the parties to the contract rescind mutually or that one or the other thereof defaults and the sale or exchange is not fully effected.' Lockett v. Drake, 43 Ariz. 357, 31 P.2d 499, 500; Sligh v. Watson, 69 Ariz. 373, 214 P.2d 123."

In the instant case, plaintiff did not procure the buyer, and does not claim to have done so.

Plaintiff's claim is based upon the printed portions of the escrow instructions which provide that in the event of a cancellation plaintiff shall be paid one-half of the earnest money. Plaintiff also bases his claim upon his testimony that this is an established custom in Phoenix. The law in regard to the rights of a broker to a commission is set forth in Diamond v. Haydis, supra. While the law entitles a broker to a commission, even though the buyer defaults on a binding contract, this does not entitle the broker to a part of the earnest money *in a case where the broker did not procure the buyer who posted the earnest money.* The law gives the broker a commission where he procures a buyer with whom the seller enters into a binding contract, because the broker has performed the service for which it was agreed to compensate him. All the conditions provided for in the agreement must be performed before a broker is entitled to a commission. Diamond v. Haydis, supra. In the instant case the procuring of a lease with Doccor, Inc., was one of the conditions of the agreement. This condition was not met.

The custom of paying the broker only one-half the earnest money in the event of a subsequent default is undoubtedly based upon a desire to salvage part of the earnest money for a seller who has been inconvenienced or hurt financially by the default. But whether law or custom is the basis of a claim for a commission, we have found no case holding that a broker is entitled to compensation out of the earnest money deposited in connection with a deal in which the broker was not the procuring cause of the prospect whose default freed the earnest money from the contract of sale. As we said in Nordale v. Fisher, 93 Ariz. 342, 380 P.2d 1003, plaintiff, in order to recover, must show that he was "the efficient, proximate and procuring cause of the sale."

In the instant case it would have been necessary to show that the broker procured the signed lease of the doctors which was one of the conditions of the agreement. If plaintiff had succeeded in getting the doctors to sign a lease and put up earnest money, then, upon a default by the doctors, it might be argued that plaintiff would be entitled to his commission, or one-half of the earnest money, depending upon the exact facts. But where the only money posted came from the buyer with whom plaintiff had no connection we think that it is clear that plaintiff had no right to any of the earnest money deposited in escrow by such buyer. This is particularly true where, as here, the buyer's default was at least partially caused by the failure of plaintiff to procure a lease from the doctors.

Affirmed.

BERNSTEIN and LOCKWOOD, JJ., concur.